**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) UNION PACIFIC RAILROAD ) <br> COMPANY, a Delaware corporation, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> (2) VANESSA SANDUSKY, ) <br> ) <br> Defendant. ) | Case No. CIV-18-350-PRW |

## **ORDER**

Defendant Vanessa Sandusky filed various motions taking issue with Plaintiff Union Pacific Railroad Company's responses to her issued discovery (Dkts. 55, 56, 82). Just prior to a scheduled hearing to resolve the motions, UPRC agreed to supplement its discovery responses. The Court directed the parties to tell it what, if anything, remained at issue following UPRC's supplemental responses. Sandusky complains that most of the defects in UPRC's responses remain. The Court addresses the remaining disputes below.

*Interrogatories*

Sandusky contends that UPRC's failure to withdraw any of its original objections leaves the issues raised in the motion to compel still live. Sandusky asks the Court to overrule UPRC's objections and order UPRC to fully answer the interrogatories.

Generally speaking, if a party wishes to object to an interrogatory, it must state the grounds for doing so with specificity.[1] The objecting party "must explain how the objection

---

[1] Fed. R. Civ. P. 33(b)(4).

1

applies," and the court has the discretion to disregard a general objection or deem the objection waived.[2] Importantly, the objecting party must "answer anything outside of the scope of the objection."[3]

Also relevant here, under Rule 33(d), a party has the option to respond to an interrogatory by specifying business records if the burden of determining the answer would be "substantially the same for either party" and the responding party provides "sufficient detail to enable the [requesting] party to locate and identify [the records] as readily as the responding party could." If the responding party chooses to invoke 33(d), it "must identify *its own* records;" the responding party cannot invoke Rule 33(d) to direct the requesting party to the requesting party's own records or a third party's records.[4]

*Interrogatory No. 1*

Sandusky requests UPRC to identify who answered each request for admission and each interrogatory, and which request or interrogatory they answered. UPRC objects because the request "seeks information beyond what is required by the Oklahoma Discovery Code" and is not relevant or likely to lead to the discovery of admissible evidence. In its supplement, UPRC provides a list of people without identifying which requests each person answered.

---

[2] Steven S. Gensler & Lumen N. Mulligan, *Federal Rules of Civil Procedure, Rules and Commentary* V. Rule 33 (Feb. 2020 Update).

[3] *Id.*

[4] Gensler & Lumen, *supra*, V. Rule 33.

UPRC's general objection and failure to answer anything outside of the scope of the objection are without merit. UPRC's objection is overruled and UPRC is ordered to fully answer the interrogatory by specifically stating to which request and/or interrogatory each answer corresponds, and to do so within seven days of the date of this order.

*Interrogatory No. 2*

Sandusky asks UPRC to identify who gathered documents requested in the requests for production and which documents were gathered by each person. UPRC objects for the same reasons as it did to Interrogatory No. 1. In its supplemental response, UPRC identifies Erica Ben, but Sandusky objects that she is not railroad personnel, which is what the interrogatory requested. UPRC explains that Ms. Ben is, in fact, railroad personnel. Sandusky's motion to compel as to Interrogatory No. 2 is accordingly denied.

*Interrogatory No. 3*

Interrogatory No. 3 seeks all facts that explain UPRC's responses to each request for admission that is not an unconditional admission. UPRC objects that phrases in the interrogatory, like "in detail" and "all facts," are overly broad. UPRC did not supplement this response. Instead, it asserts that it supplemented its responses to the requests for admission and provided the information in those responses.

UPRC does not provide a specific and persuasive explanation for its objection, and it does not answer with information outside of the scope of its objection. Moreover, UPRC's reference to other discovery answers is insufficient. UPRC's objection is accordingly overruled and UPRC is ordered to fully answer the interrogatory within seven days of the date of this order.

*Interrogatory No. 4*

Sandusky requests information concerning plans implemented to remediate her property. UPRC referred her to the reports that she and her predecessors previously received from the Oklahoma Department of Environmental Quality. UPRC's supplement includes a table with document names, summaries of plans, and dates. The supplement thus fully answers the interrogatory and Sandusky's motion to compel is denied.

*Interrogatory No. 5*

Interrogatory No. 5 requests information concerning UPRC's employees with factual knowledge of the pollution, UPRC's efforts to remediate and control the pollution, and UPRC's efforts to restore Sandusky's property. UPRC objects that the phrase "and/or restoring the water aquifer" is overly broad and vague, but it provides the names of some employees without any of the specific information requested. UPRC supplemented its response with the names, dates, and titles of the employees, as well as each employee's role as it relates to the site.

UPRC's objection is overruled because the interrogatory is limited in scope to matters relating to the spilled pollution at the crux of this dispute. UPRC is ordered to fully answer the interrogatory by including each listed employee's knowledge of facts related to the actions and/or omissions of UPRC in remediating the spilled pollution at the property, controlling the migration of the spilled pollution, and/or restoring the water aquifer on the property, and to do so within seven days of the date of this order.

*Interrogatory No. 7*

Sandusky asks UPRC to identify all persons with knowledge of facts relating to the Settlement Agreement and to describe that knowledge in detail. UPRC makes a general objection that this information is protected by the attorney client privilege and work product doctrine, and then states that the parties to the Settlement Agreement and their counsel have knowledge of the facts relating to the Settlement Agreement. UPRC supplements this response with a list of people and their titles.

Again, UPRC's general objection with no specific explanation of why the privilege or doctrine applies to the responsive materials is insufficient. Moreover, UPRC has not identified what knowledge of the relevant facts is possessed by each person it listed. UPRC's objection is accordingly overruled and UPRC is ordered to fully answer the interrogatory within seven days of the date of this order.

*Interrogatory No. 8*

Sandusky asks UPRC to identify specific instances when UPRC requested access to Sandusky's property and she denied it access. UPRC informs the Court that it will supplement its response. UPRC is ordered to do so within seven days of the date of this order.

*Interrogatory No. 11*

Interrogatory No. 11 seeks information concerning UPRC's success in remediating Sandusky's property. UPRC objects to this interrogatory as overly broad and vague, then refers Sandusky to documents and reports submitted to the ODEQ. In its supplement,

UPRC adds that the remediation work is "ongoing in areas where [UPRC] has access," and refers Sandusky to its supplemental response to Interrogatory No. 4.

UPRC has made no real attempt to answer this interrogatory. The term "success" in this context is in no way confusing—it refers to successes in remediation of the pollution. Moreover, UPRC improperly refers to third-party documents and another interrogatory answer, and even then, it does not specify which portions of the "many documents and reports submitted to ODEQ" are responsive to this interrogatory. UPRC's objection is overruled and UPRC is ordered to fully answer the interrogatory within seven days of the date of this order.

### *Requests for Admission*

Sandusky asserts that UPRC's supplemental responses to her requests for admission generally suffer from the same legal defects as its initial responses. She also argues that UPRC cannot change admissions to denials and vice versa without leave of court.

If a responding party chooses not to admit to a Request for Admission, then it must "specifically deny it or state in detail why the [responding] party cannot admit or deny it."[5] A responding party may object by stating the grounds for objection.[6] If the court finds that an objection is not justified, then it "must order that an answer be served."[7] If the Court

---

[5] Fed. R. Civ. P. 36(a)(4).

[6] *Id.* 36(a)(5).

[7] *Id.*

finds that an answer does not comply with Rule 36, then it "may order either that the matter is admitted or that an amended answer be served."[8]

*RFA No. 4*

This request asks UPRC to admit to submitting the Remedial Action Work Plan to ODEQ with goals of reducing CT to no greater than maximum contaminant levels and limiting migration of CT into groundwater. UPRC originally admitted to submitting the document and that the document "states what is stated therein" but denied the RFA as to anything inconsistent with the document. In its supplement, UPRC denies the RFA, but then provides its own characterization of the plan, which it then admits. While UPRC claims there is "nothing evasive about its response," the Court disagrees. UPRC must either straightforwardly admit or deny the RFA, and it is hereby ordered to do so within seven days of the date of this order.

*RFA No. 5*

RFA No. 5 asks UPRC to admit that it and the ODEQ knew when the Consent Agreement and Final Order for Site Remediation was approved in 1995 that groundwater had been contaminated and remediation would require controlling migration of contaminated groundwater and restoring the aquifer to a level no greater than the maximum contaminant levels for CT. UPRC admitted that the CAFO "states what is written therein" and that part of the remediation efforts would be directed to limiting the spread of the released material and reducing the levels of contaminants from the release in the

---

[8] *Id.*

groundwater. In its supplement, UPRC changes its admission to a denial and explains specifically what it knew.

The Court denies Sandusky's motion to deem this RFA admitted because the RFA is complex, so UPRC's denial is technically warranted. In addition, UPRC strives to provide the relevant information by explaining its denial but also what specific information it had. Finally, the Court disagrees that UPRC needed leave to change its admission to a denial, as UPRC had permission to supplement its responses.

*RFA No. 6*

RFA No. 6 asks UPRC to admit that the CAFO included a work plan to remediate the spilled pollution in order to achieve the regulatory goals. Initially UPRC admitted that "the CAFO states what is written therein." Then UPRC supplemented its response, admitting and denying the RFA in part, and then explaining in detail its admission but explaining nothing about its denial. Due to UPRC's failure to specifically deny parts of the RFA, UPRC is ordered to supplement its response and specifically identify which parts of the RFA it is denying, and to do so within seven days of the date of this order.

*RFA No. 7*

RFA No. 7 seeks an admission that prior to the filing of this lawsuit, the Spilled Pollution was not fully remediated by UPRC in accordance with any plan of remediation to the satisfaction of regulatory goals. UPRC denied this RFA and stated that its efforts have been hampered by Sandusky's refusal to allow UPRC access to her property. In its supplement, UPRC changes its denial to an admission then includes additional statements that appear to qualify its admission. Although UPRC alludes to ambiguity and that its

answer includes a partial denial, it is unclear what portions of the RFA UPRC attempts to deny. As a result, UPRC must supplement its answer and specify *exactly* what parts of the request it is denying, and it must do so within seven days of the date of this order.

*RFA No. 9*

RFA No. 9 requests UPRC to admit that the air sparge and vapor extraction system implemented failed to fully remediate the Spilled Pollution, control migration of contaminated groundwater, or restore groundwater aquifer to a level greater than the maximum contaminant levels for CT. UPRC objected to the RFA as vague because it is unclear what is meant by "fully remediate the Spilled Pollution," then "admitt[ed] what it has stated to the ODEQ in the relevant reports." In its supplement, UPRC admits that the system had some initial results that were effective, but ultimately effectiveness decreased over time, and denies the rest of the request.

UPRC's objection to vagueness is overruled. "Spilled Pollution" is a defined term in the RFAs, and the meaning of "remediation" is clear; it is even used by UPRC in its supplement. Even so, UPRC delineates its admission from its denial, so its answer is sufficient. Sandusky's motion to deem RFA 9 admitted is denied.

*RFA No. 11*

RFA No. 11 asks UPRC to admit that as part of the Settlement Agreement UPRC and the Layton Family agreed to the Initial Access Agreement in which the parties recited their intent to have the plume of contamination on the property fully delineated and properly characterized so that the spilled pollution could be remediated. UPRC admitted that the Settlement Agreement and initial access agreement "state[] what is stated therein,"

9

and that the parties entered into the initial access agreement, but otherwise denied the RFA. In its supplement, UPRC denies the RFA and explains its denial with more specific language from the agreements. Although this appears to be a denial in form but not substance, the Court finds UPRC's answer sufficient. Sandusky's motion to deem this RFA admitted is denied.

*RFA No. 12*

RFA No. 12 asks UPRC to admit that as part of the Settlement Agreement, UPRC and the Layton Family agreed to the Initial Access Agreement in which the Layton family recited their intent to grant railroad access to the property for a specified period of time so UPRC could conduct remediation of the spilled pollution, including installation of wells and a remediation system on the Property. UPRC's response referred Sandusky to its answer to RFA No. 11 and "otherwise [] denied" the rest of the request. Its supplement refers Sandusky to its supplemental response to RFA No. 11.

Rather than answer the RFA, UPRC chose to reference another response and ambiguously "otherwise" deny the remainder of the request, which is no answer at all. UPRC is ordered to fully respond to this interrogatory within seven days of the date of this order.

*RFA No. 13*

RFA No. 13 requests UPRC to admit that a second attempt to remediate the Spilled Pollution was made in 2004 by UPRC using remedial technology and utilizing air stripping/soil vapor extraction in a wellhead system. Then, after the data from the pilot study showed little to no effectiveness, the system was shut down based on the

recommendation of the environmental consultant. UPRC admitted this RFA "generally," then referred Sandusky to documents maintained by ODEQ. In its supplement, UPRC refers to its supplemental response to Interrogatory No. 4, and adds the referenced remediation lasted a year and the consultant at the time then concluded that the remediation system was not effective for the site.

UPRC does not specifically deny any portion of this RFA and improperly refers to other documents and answers. UPRC is ordered to fully respond to this interrogatory within seven days of the date of this order.

*RFA No. 14*

RFA No. 14 asks UPRC to admit that the efforts UPRC made were ineffective to fully and effectively remediate the spilled pollution, and UPRC and ODEQ knew this by the end of September 2006 at which time all existing remediation systems had been shut down due to ineffectiveness. UPRC objected to this request as vague and incomplete, admitted to monitoring and trying several remediation efforts with ODEQ approval, and then denied the rest of the RFA and referred Sandusky to documents maintained by ODEQ. In its supplement, UPRC refers Sandusky to its supplemental response to Interrogatory No. 4.

UPRC has not offered a convincing explanation as to how RFA No. 14 is vague and incomplete, so UPRC's objection on that basis is overruled. UPRC is thus ordered to fully respond to this RFA within seven days of the date of this order. It should go without saying by this point, but a proper response will either unqualifiedly admit or deny the interrogatory, or if the interrogatory is admitted in part and denied in part, it will

specifically identify the portions of the interrogatory that are admitted and the portions that are denied.

*RFA No. 15*

RFA No. 15 asks UPRC to admit that a third remediation plan was developed by UPRC to remediate the spilled pollution which involved a Membrane Interface Probe study to be followed by the implementation of a passive reactive barrier and that this plan was never implemented—thus, there was no effective and full remediation of the spilled pollution as a result of that plan. UPRC admitted that the 2008 remediation plan was developed to remediate the area affected by the materials release and that this plan was never implemented, but then denied the rest of the RFA because "it is unclear on what is meant by the phrase 'effective and full remediation.'" UPRC also referred Sandusky to ODEQ documents. UPRC's supplement refers Sandusky to its supplemental response to Interrogatory No. 4.

UPRC's supplemental response improperly refers Sandusky to another discovery answer, while UPRC's original response to RFA No. 15 was sufficient. UPRC admitted to specific portions and denied other with an explanation where necessary. Sandusky's motion to deem RFA 15 admitted is denied.

*RFA No. 18*

RFA No. 18 asks UPRC to admit that in January 2012, UPRC was not implementing any plan to fully remediate the spilled pollution and the ODEQ advised UPRC that: (1) CT in the spilled pollution was hazardous waste because it was present in concentrations above .5 mg/L in the surface creek water and groundwater; (b) CT in the surface water was a

violation of the federal Clean Water Act; (c) hazardous waste was being released into the creek on the Property; (d) the CT plume was going under the creek so it can enter the Cimarron River directly; and (e) the ODEQ rejected UPRC's plan to use risk assessment for the spilled pollution, stating that risk assessment should not be used in such a way that it would relieve UPRC of its regulatory obligations. UPRC denied that it was not implementing any plan and admitted that the letter states what is written therein. In its supplement, UPRC adds that it was investigating all through this time in order to get a remediation plan and refers Sandusky to its supplemental response to Interrogatory No. 4.

UPRC's admission to what is written in the referenced document is insufficient, and UPRC fails to admit or deny the specific portions of the RFA. UPRC is ordered to fully respond within seven days of the date of this order.

*RFA No. 21*

RFA No. 21 asks UPRC to admit that by 2013 the results of testing from the monitoring well installed by UPRC showed that CT was moving along the banks of the Cimarron River and the contaminant groundwater was probably impacting the river. UPRC objects that this RFA is vague because it does not identify what "testing" or "probably" means. UPRC then refers Sandusky to documents maintained by ODEQ. In its supplement, UPRC denies the RFA as written because it is unaware of monitoring that shows that CT was "moving along the banks" of the Cimarron River and that monitoring has only shown CT discharge to the river at very low concentrations.

UPRC supplemental answer denies the RFA in its entirety, so its objection on vagueness grounds is moot, and Sandusky's motion to deem the RFA admitted is denied.

13

*Requests for Production*

Sandusky complains that although UPRC made a subsequent production of documents after June 1, 2020, UPRC's failure to withdraw its objections to her requests for production or to amend any of its responses to the requests for production do "nothing to resolve the essential discovery disputes" contained in her original motion to compel.

A party can request relevant documents from another party; the request must describe the requested documents with "reasonable particularity."[9] The response must state that the documents will be produced (or inspection will be allowed) or the grounds for objection with specificity, "including the reasons."[10] The objection must specify whether there are documents being withheld based on that objection. A partial objection must specify the part objected to, and the objecting party must produce the documents outside of the scope of the objection.[11] "[W]hen a discovery request appears relevant on its face, the party resisting the request bears the burden to establish that the requested discovery: (1) does not come within the broad scope of relevance as defined by Rule 26(b)(1), or (2) is of such marginal relevance that the potential harm the discovery may cause outweighs the presumption in favor of broad disclosure."[12]

---

[9] *Id.* 34(a).

[10] *Id.* 34(b)(2)(B).

[11] *Id.* 34(b)(2)(c); *Bays*, 2009 WL 10674508, at *3 ("If a party objects to part of a request for production, it must state its objections and specify the objectionable part of the request, include its reasons for the objection, and produce information responsive to the non-objectionable portion of the request.").

[12] *Bays*, 2009 WL 10674508, at *3.

Even if UPRC met its production requirements, it failed to properly specify which documents it withheld based on the general objections it made, and which documents it produced outside the scope of that objection.[13] Without this information, both Plaintiff and the Court are left guessing about the sufficiency of its responsive production.[14] UPRC is accordingly ordered to try again, lodging specific objections to Sandusky's requests and explaining the specific documents it withholds based on its specific objections and the specific documents it produces outside the scope of its objections within seven days of the date of this order. If the parties cannot work together to resolve UPRC's objections once UPRC provides more clarity about its reasoning and the documents affected, Sandusky may promptly notify the Court.

*Conclusion*

For the foregoing reasons, Dkts. 55 and 56 are **GRANTED IN PART AND DENIED IN PART** and Dkt. 82 is **GRANTED in PART** and the remainder is **MOOT**, as set forth more fully above. Plaintiff UPRC is **ORDERED** to lodge specific objections to Defendant Sandusky's requests for production and explain the specific documents it

---

[13] *See, e.g., Outdoor Channel, Inc. v. Performance One Media, LLC*, No. 10-CV-30-JHP-PJC, 2011 WL 864333, at *1 (N.D. Okla. Mar. 10, 2011) ("Because the document responses do not adequately explain what documents have been produced and what documents have not been produced, there is no way of ascertaining the adequacy of the response. Plaintiff has no idea of the completeness of Defendants' responses, and neither does the Court.").

[14] *Id*.

withholds based on its specific objections and the specific documents it produces outside the scope of its objections within seven days of the date of this order.

**IT IS SO ORDERED this 4th day of August, 2020.**

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE